## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, *ex rel.*
[PARTY X]

      Plaintiff/Relator,

-v-

[PARTY Y]

    Defendant.

)
)
)
)
)
)
)
)
)
)

17cv 23550
Williams / Torres

**SEALED MOTION TO FILE**
**COMPLAINT UNDER SEAL**

# FILED UNDER SEAL

FILED by _____ D.C.

SEP 2 7 2017

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – W.P.B.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* GAEL SILVERMAN <br><br> and <br><br> THE STATE OF FLORIDA *ex rel.* GAEL SILVERMAN <br><br> Relator/Plaintiffs, <br><br> -v- <br><br> KINDRED HEALTHCARE, INC. <br><br> and <br><br> KINDRED HOSPICE SERVICES, L.L.C. d/b/a KINDRED MIAMI HOSPICE <br><br> and <br><br> GENTIVA HEALTH SERVICES (CERTIFIED), INC. <br><br> and <br><br> ODYSSEY HEALTHCARE OF MARION COUNTY, LLC <br><br> Defendants. | Case No. *17 cv 23552* <br><br> (Judge *Williams/Torres*) <br><br> **COMPLAINT AND JURY DEMAND** <br><br> **TO BE FILED UNDER SEAL** |

FILED by _____ D.C.

SEP 2 7 2017

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – W.P.B.

2

## I.   **INTRODUCTION**

This is an action by *qui tam* Relator Gael Silverman ("Relator" or "Ms. Silverman"), through the undersigned counsel, made on behalf of the United States of America ("United States") and the State of Florida against Kindred Healthcare, Inc., Kindred Hospice Services, L.L.C. d/b/a Kindred Miami Hospice, Gentiva Health Services (Certified), Inc., and Odyssey Healthcare of Marion County, LLC (collectively, "Kindred" or "Defendants") for using, making, presenting, and causing to make, use, or present false statements and claims to the government in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* and Florida False Claims Act, FLA. STAT. § 68.082, *et seq.*

Kindred Miami Hospice is one of Kindred's largest hospice facilities in the United States with a census of approximately 400 patients. Ms. Silverman worked at Kindred Miami Hospice as a Quality Manager from April 2014 to December 2016, where she was responsible for auditing hospice patients' medical records and reviewing their hospice eligibility. In this capacity, Ms. Silverman gained intimate knowledge of the patient census and learned of Kindred's various fraudulent schemes aimed to generate illegal profits by manipulating and unlawfully inflating its hospice census. In addition and more specifically, Kindred is:

> (a)   wrongfully admitting and certifying/recertifying patients into hospice care who are not "terminally ill" and who are ineligible and do not qualify for hospice care; and
>
> (b)   illegally placing hospice patients on, and failing to take patients off, costlier levels of care (*i.e.*, continuous care and general inpatient care) than that which is medically necessary.

Ms. Silverman resigned from Kindred in December 2016, in part due to the fraudulent practices alleged herein. She estimates that between 35%–50% of the hospice patients in the census at Kindred Miami Hospice at the time of her resignation are either not eligible for hospice

services or receiving costlier levels of hospice care than what is medically necessary. Indeed, when

Ms. Silverman left Kindred Miami Hospice in December of 2016, there were:

- 180+ patients in the active census with Length of Stays ("LOS") in excess of 180 days (representing a LOS in excess of the initial 90 day certification and a 90 day recertification period);

- 50+ patients in the active census with a LOS of more than 730 days;

- 22 patients in the active census that had been in hospice care continuously from 2012 *and earlier*; and

- 1 patient that had been in hospice care continuously since 2009.

Nevertheless, Kindred continues to wrongfully bill the government for the hospice services, as well as for room and board. Upon information and belief, the same fraudulent practices are occurring at three other Kindred hospice facilities in Florida: (i) the Daytona Beach facility; (ii) the Ocala facility; and (iii) the Tavernier facility. Ms. Silverman estimates that since 2011, Kindred has wrongfully received over tens of millions of dollars at its Miami facility alone and has wrongfully received additional governmental funds at all four facilities. The fraud continues today.

Under the terms of the False Claims Act, this Complaint is to be filed *in camera* and under seal and is to remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders. The government may elect to intervene and proceed with the action within the sixty-day time frame, or within any extensions of that initial sixty-day period granted by the Court for good cause shown, after it receives both the Complaint and the Material Evidence submitted to it.

For her cause of action, Ms. Silverman alleges as follows:

**Dimond, Kaplan & Rothstein, P.A.**
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920  Fax: 561-370-1401

## II.   NATURE OF THE ACTION

1.      This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733.

2.      Under the False Claims Act, a private person may bring an action in federal district court for herself and for the United States, and may share in any recovery.  31 U.S.C. § 3730(b). That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## III.   JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345.

4.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact and have transacted business in this District.

5.      Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendants transacted business in this District.

## IV.   PARTIES

6.      Ms. Silverman brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS"), its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HCFA")), and all other government healthcare programs, such as Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIP, and Veterans Administration ("VA").

7.      Ms. Silverman also brings this action on behalf of the State of Florida, including all state counterpart agencies to the federal agencies referenced above.  (For drafting convenience,

all federal and state healthcare programs together, "Medicare").

8.      Ms. Silverman also brings this action on behalf of herself, as permitted under the False Claims Act. Ms. Silverman is a citizen of the United States and a resident of the State of Florida. Ms. Silverman worked at Kindred Miami Hospice as a Quality Manager, responsible for auditing hospice patients' medical records and reviewing their hospice eligibility. In particular, Ms. Silverman was responsible for reviewing each patient's medical documentation and determining whether it supported a "terminally ill" diagnosis or justified continuous care, thereby warranting hospice care. Ms. Silverman has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. Ms. Silverman is the original source of these allegations, and has knowledge of the false claims and records that Kindred knowingly, falsely and fraudulently submitted to the government as alleged herein.

9.      Defendant Kindred Healthcare, Inc. is a Delaware corporation with its principal place of business at 680 South Fourth Street, Louisville, Kentucky 40202. Kindred Healthcare, Inc. is a healthcare services company that operates hospitals, nursing centers, and hospice facilities across the United States.

10.      Defendant Kindred Hospice Services, L.L.C. d/b/a Kindred Miami Hospice is a Delaware limited liability company headquartered at 680 South Fourth Street, Louisville, Kentucky 40202. Upon information and belief, Kindred Hospice Services, L.L.C. is a subsidiary of Kindred Healthcare, Inc. that oversees all Kindred hospice facilities nationwide, including Kindred Miami Hospice.

11.      Defendant Gentiva Health Services (Certified), Inc. ("Gentiva") is a Delaware limited liability company headquartered at 680 South Fourth Street, Louisville, Kentucky 40202. Gentiva provides healthcare and hospice services to individuals across the United States, including

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920   Fax: 561-370-7401

those patients at Kindred Miami Hospice.  In 2015, Kindred Healthcare, Inc. merged with Gentiva

Health Services, whereby Gentiva became a wholly-owned subsidiary of Kindred.  The Hospice

Policy Manual governing hospice procedures at Kindred Miami Hospice, and other facilities across

the U.S., was prepared and implemented by Gentiva.

12.     Defendant Odyssey Healthcare of Marion County, LLC ("Odyssey") is a Delaware

limited liability company headquartered at 680 South Fourth Street, Louisville, Kentucky 40202.

Odyssey is a subsidiary of Gentiva and Kindred that manages the Kindred Miami Hospice facility,

which is located at 6161 Blue Lagoon Drive, Suite 170, Miami, Florida 33126.

## V.     LEGAL FRAMEWORK

### A.     The False Claims Act

13.     The False Claims Act ("FCA") provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to a false or fraudulent claim; [or]
>
> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to an obligation to pay or transmit
> money or property to the Government, or knowingly conceals or
> knowingly and improperly avoids or decreases an obligation to pay
> or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, . . . plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person.

31 U.S.C. § 3729(a).  The Affordable Care Act requires a person who has received an overpayment

of Medicare or Medicaid to report and return the overpayment within 60 days of identification or

the date any corresponding cost report is due, and failure to report and return the overpayment is

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920  Fax: 561-370-1401

an obligation for the purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G).  *See* 42

U.S.C. § 1320a-7k(d).

  14.  For purposes of the FCA:

    (1) the terms "knowing" and "knowingly"

      (A) mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

      (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).  Effective November 2, 2015 (the date of enactment of the Federal Civil

Penalties Inflation Adjustment Act, Improvements Act of 2015, Public Law 114-74, sec. 701

("2015 Amendments")), the penalties increased from a minimum-maximum per-claim penalty of

$5,500 and $11,000 to $10,781 and $21,563.  The increased amounts apply to civil penalties

assessed for violations occurring after November 2, 2015.  Violations that occurred on or before

November 2, 2015 are subject to the previous penalty amounts.  On February 3, 2017, pursuant to

the 2015 Amendments annual re-indexing of the FCA penalties for inflation, the civil penalties

again increased to the current minimum-maximum per-claim penalty of $10,957 and $21,916.

  **B.**  **The Medicare Program**

  15.  The Health Insurance for the Aged and Disabled Program, popularly known as the

Medicare program, was created in 1965 as part of the Social Security Act ("SSA") to pay the costs

of certain healthcare services for eligible individuals.  The Secretary of Health and Human Services

("HHS"), an agency of the United States whose activities, operations, and contracts are paid from

federal funds, administers the Medicare program through the Health Care Financing

Administration ("HCFA"), a component of HHS.

16.     Medicare is a 100% federally subsidized health insurance system for eligible Americans, including those aged 65 and older, certain disabled people, and certain people with chronic diseases who elect coverage. 42 U.S.C. § 1395c; *see* 42 U.S.C. §§ 1395j, 1395w.

17.     Under the terms and policies of insurance, Medicare only provides benefits for medically necessary services rendered by eligible and appropriately licensed providers. *See* 42 U.S.C. § 1395y(a)(1)(A). Medicare has no obligation to pay claims or provide benefits for unnecessary services.

18.     To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance. 42 U.S.C. § 1395cc; 42 C.F.R. § 412.23(e)(1). Medicare service providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford Co., Inc.,* 467 U.S. 51, 64–65 (1984).

19.     In order to bill Medicare, a provider must submit a form called the CMS 1500. The form describes, among other things, the provider, the patient, the referring physician, the services provided by procedure code, the related diagnosis code(s), the dates of service, and the amounts charged. The provider certifies on the CMS 1500 claim that the information provided is truthful and that the services billed on the form were "medically indicated and necessary."

20.     Reimbursement for Medicare claims is made by the United States through HHS. CMS is an agency of HHS and is directly responsible for the administration of the Medicare program. CMS, in turn, contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. *See* 42 U.S.C. § 1395u. Claims submitted for reimbursement are to be paid in accordance with the Social Security Act, Code of Federal Regulations, and Medicare Rules and Regulations promulgated by CMS.

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920  Fax: 561-370-7401

C.     **The Medicaid Program**

21.     Medicaid is a joint federal-state program that pays for healthcare services for low-income individuals, including pregnant women, children, and parents and other caretaker relatives, as well as elderly and disabled individuals.  As a result of the Affordable Care Act, each state had the option to expand eligibility for Medicaid beginning in calendar year 2014 to all nonelderly adults with income below 138 percent of the federal poverty guidelines.

22.     Medicaid is jointly funded by state and federal governments.   The federal government's share of each state's Medicaid spending, known as the Federal Medical Assistance Percentage ("FMAP"), is based upon the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).  Such share must be at least 50 percent, but no more than 83 percent, and historically has averaged about 57 percent.  In other words, the federal government guarantees to match at least $1 in federal funds for every $1 any individual state spends on its Medicaid program.  The FMAP for the State of Florida for the 2017 fiscal year, for example is 61.10%.  Meaning that for every $1 the State of Florida allocates to its Medicaid program, the federal government will match an additional $1.57.

23.     State Medicaid programs must comply with the minimum requirements set forth in the federal Medicaid statute to qualify for federal funding. 42 U.S.C. § 1396a.  In order to receive reimbursement from Medicaid, a provider must submit a signed claims form to the state's Medicaid program, certifying that the information on the form is "true, accurate, and complete." 42 C.F.R. § 455.18. The provider further certifies that it "understand[s] that payment of this claim will be from federal and state funds, and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws." *Id.*

24.     By participating in a state's Medicaid program, Defendants are charged with actual

notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicaid program, and have consented to compliance with all such statutes, regulations, and rules, including those governing reimbursement.

### D.     The Hospice Program

25.     In general, hospice is a program designed to provide patients with palliative care (*i.e.*, care designed to relieve pain, symptoms, or stress caused by a terminal illness) rather than curative care (*i.e.*, care designed to cure an illness). Electing for hospice care is a critical decision for an individual patient because he or she is choosing to cease and forego further curative care for his or her illness. *See* 42 C.F.R. § 418.24.

26.     Hospice care is covered under Medicare Part A and Medicaid. 42 U.S.C. §§ 1395d, 1396a. The Medicaid requirements for hospice care are the same as those under Medicare. *See* 42 U.S.C. § 1396d(o) (Medicaid statute requiring that hospice care be provided in accordance with the policies and procedures established by Medicare 42 U.S.C. § 1395, *et seq.*). The duration of hospice coverage may be for: (a) an initial period of 90 days; (b) a subsequent period of 90 days; or (c) a subsequent unlimited number of 60-day periods. 42 C.F.R. § 418.21.

27.     An individual must be "terminally ill" to be eligible for hospice care. 42 U.S.C. § 1395y(a)(1)(C). An individual is "terminally ill" if he or she has a medical prognosis of six months or less to live if the individual's illness runs its normal course. 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. §§ 418.3, 418.20, 418.22(b). No payment may be made to a hospice provider for hospice services which are "not reasonable and necessary for palliation or management of terminal illnesses." 42 U.S.C. § 1395y(a)(1)(C); 42 C.F.R. § 418.200. Hospice providers must also have in place a discharge planning process in case a patient's condition stabilizes or improves such that the patient can no longer be certified as terminally ill. 42 C.F.R. § 418.26(d).

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920   Fax: 561-370-7401

28.     The hospice provider must certify in writing that the individual is, in fact, "terminally ill."  42 U.S.C. § 1395f(a)(7).  The hospice provider must obtain this written certification before it submits a claim for payment.  42 C.F.R. § 418.22(a).  For the first 90-day period, the patient's attending physician and the hospice provider's medical director must "each certify in writing at the beginning of the period that the individual is terminally ill."  42 U.S.C. § 1395f(a)(7)(A)(i).  For subsequent 60- or 90-day periods, the medical director and physician must again "recertif[y] . . . that the individual is terminally ill . . . ."  42 U.S.C. § 1395f(a)(7)(A)(ii).  Prior to the 180th-day recertification, a hospice physician or nurse practitioner must have a "face-to-face encounter with the individual to determine continued eligibility of the individual for hospice care . . . ."  42 U.S.C. § 1395f(a)(7)(D).

29.     Throughout the duration of hospice services, the hospice provider must maintain sufficient records and documentation to support each hospice patient's medical prognosis.  42 C.F.R. § 418.22(b) & (d).  Each certification must be supported by specific clinical findings and other documentation that support a determination that the patient has a life expectancy of six months or less.  42 C.F.R. § 418.22.  "A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare."  70 Fed. Reg. 70532, 70534–35.

30.     Hospice providers are paid a per diem rate based on the number of days and level of care provided to the patient.  There are four levels of hospice care: (1) routine home care; (2) continuous home care; (3) inpatient respite care; and (4) general inpatient care.  42 C.F.R. § 418.302(c).  The payment rates are based on which level of care the hospice provider furnishes to a patient on a particular day.  *Id.*; Medicare Benefit Policy Manual, Chapter 9, § 40.  Most hospice care is and should be billed as routine home care.  Hospice providers receive the highest daily rate

of reimbursement for continuous home care ("continuous care").

31.     In 2016, the hospice payment rates under Medicare were: (1) $161.89 per day for routine home care; (2) $944.79 per day for continuous home care (or $39.37 per hour); (3) $167.45 per day for inpatient respite care; and (4) $720.11 per day for general inpatient care.  Department of Health and Human Services, Centers For Medicare & Medicaid Services, *Update to Hospice Payment Rates, Hospice, Cap, Hospice Wage Index and Hospice Pricer for Fiscal Year (FY) 2016*, available     at     https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/MM9301.pdf (last visited August 3, 2017).  The Medicaid payments are comparable to the rates provided by Medicare.[1]  Medicaid also covers room and board for eligible inpatient hospice patients.  The per diem rate for room and board varies for each hospice provider.

32.     Continuous care is available only for patients who are experiencing a "brief period . . . of crisis" that requires the immediate and short-term provision of skilled nursing hospice services to allow the patient to remain at their residence.  42 C.F.R. § 418.302(b)(2).  Medicare defines a "period of crisis" as "a period in which the individual requires continuous care to achieve palliation and management of acute medical symptoms." *Id.* at § 418.204(a).

33.     To bill Medicare for continuous care, a hospice must provide care for at least eight hours in a 24-hour period, counted from midnight to midnight; the care must be predominantly nursing care, meaning care provided by a registered nurse (RN), licensed practical nurse (LPN),

---

[1] In 2016, the Medicaid hospice payment rates were: (1) $162.10 per day for routine home care; (2) $945.16 per day for continuous home care; (3) $176.26 per day for inpatient respite care; and (4) $720.11 for general inpatient care.  Department of Health & Human Services, Center for Medicaid and CHIP Services, *Annual Change in Medicaid Hospice Payment Rates—Action*, Sept. 1  2015,  https://www.medicaid.gov/medicaid/benefits/downloads/medicaid-hospice-rates-ffy-2016.pdf (last visited August 3, 2017).

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920  Fax: 561-370-7401

or nurse practitioner (NP). *See* 42 C.F.R. §§ 418.302, 418.204.

34.    As with all hospice care, the need for continuous care must be supported by sufficient medical records and documentation; the Medicare Benefit Policy Manual provides:

> When a hospice determines that a beneficiary meets the requirements for [continuous care], ***appropriate documentation must be available to support*** the requirement ***that the services provided were reasonable and necessary*** and were in compliance with an established plan of care in order to meet a particular crisis situation. This would include the appropriate documentation of the situation and the need for continuous care services consistent with the plan of care.

Medicare Benefit Policy Manual, Chapter 9, § 40.2.1 (emphasis added).

35.    If the care lasts less than eight hours in a 24-hour period, the hospice may only bill Medicare for routine home care for that day of hospice services.  Similarly, if the care provided does not consist of predominantly nursing care, the hospice may not bill Medicare for continuous care, but must instead bill for routine home care. *See* 42 C.F.R. §§ 418.302, 418.204.

36.    Reimbursement for general inpatient care is only available for terminally ill patients who receive care in an "inpatient facility for pain control or acute or chronic symptom management which cannot be managed in other settings." 42 C.F.R. § 418.302(b)(4).  As with continuous care, the Medicare reimbursement rates provided for general inpatient care are substantially higher than routine care.  42 C.F.R. § 418.306.

## VI.    **FACTUAL ALLEGATIONS**

37.    Kindred Miami Hospice is one of Kindred's largest hospice facilities in the United States with a census of approximately 400 patients.  Ms. Silverman worked at Kindred Miami Hospice as a Quality Manager from April 2014 to December 2016, where she was responsible for auditing hospice patients' medical records and reviewing their hospice eligibility.  In this capacity, Ms. Silverman gained intimate knowledge of the patient census and learned of Kindred's various

14

**Dimond, Kaplan & Rothstein, P.A.**

**Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920   Fax: 561-370-7401**

fraudulent schemes aimed to generate illegal profits by manipulating its hospice census.   In addition and more specifically, Kindred is:

(a)   wrongfully admitting and certifying/recertifying patients into hospice care who are not "terminally ill" and who are ineligible and do not qualify for hospice care; and

(b)   illegally placing hospice patients on, and failing to take patients off, costlier levels of care (*i.e.*, continuous care and general inpatient care) than that which is medically necessary.

38.   Ms. Silverman resigned from Kindred in December 2016, in part due to the fraudulent practices alleged herein.   She estimates that between 35%–50% of the hospice patients at Kindred Miami Hospice are either not eligible for hospice services or receiving costlier levels of hospice care than what is medically necessary.   Nevertheless, Kindred continues to bill the government for ineligible and unnecessary hospice services, as well as for room and board.

**A.   Kindred Is Wrongfully Admitting and Certifying/Recertifying Patients into Hospice Care Who Are Not "Terminally Ill" and Who Are Ineligible and Do Not Qualify for Hospice Care**

39.   Kindred is a for-profit national healthcare provider of hospice services.   Kindred significantly funds its operations and its employees through receipt of Medicare dollars on behalf of individuals who are supposed to be eligible to receive Medicare hospice benefits.   When a business such as Kindred admits a Medicare recipient to hospice care, that individual no longer receives – or is entitled to receive – services that would help to cure his or her terminal illness. Instead, the individual receives palliative care aimed at relieving pain symptoms and stress of the terminal illness.   Such care includes not only medical services, but also social, psychological, emotional, and spiritual services.   The purpose of hospice care is to provide this unique benefit to individuals during the last few months of their life.

40.   It is a fundamental requirement under the hospice program that an individual must

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920   Fax: 561-370-7401

be "terminally ill" to be eligible for hospice care – *i.e.*, having a medical prognosis of six months or less to live if the individual's illness runs its normal course.  No payment may be made to hospice providers for hospice services which are not reasonable and necessary for palliation or management of terminal illnesses.

41.    Since 2011, however, Kindred has been knowingly, wrongfully, and for financial gain, admitting and retaining patients on hospice care – through wrongful certifications and recertifications – who are not terminally ill.  Relator estimates that between 35–50% of Kindred Miami Hospice's census (approximately *140–200 patients*) are ineligible for hospice care.  Indeed, when Ms. Silverman left Kindred Miami Hospice in December of 2016, there were:

- 180+ patients in the active census with Length of Stays ("LOS") in excess of 180 days (representing a LOS in excess of the initial 90 day certification and a 90 day recertification period);

- 50+ patients in the active census with a LOS of more than 730 days;

- 22 patients in the active census that had been in hospice care continuously from 2012 *and earlier*; and

- 1 patient that had been in hospice care continuously since 2009.

42.    Specific examples include:

(a)    **Patient ID# 01260764:**  Admitted at Kindred Miami Hospice on 11/27/13 despite being ineligible for hospice care.  Remained on hospice care for 1,071 days until discharge on 9/7/16;

(b)    **Patient ID# 00391593:**  Admitted at Kindred Miami Hospice on 4/30/11 despite being ineligible for hospice care. Remained on hospice care for 2,029 days until discharge on 11/17/16;

(c)    **Patient ID# 01401412:**  Admitted at Kindred Miami Hospice on 6/27/14 despite being ineligible for hospice care. Remained on hospice care for 719 days until discharge on

16

6/14/16. Later readmitted for hospice care on 8/1/16 despite ineligibility, and wrongfully remained on hospice care for another 100 days until discharge on 11/8/16;

(d)     **Patient ID# 01312276:**    Admitted at Kindred Miami Hospice on 12/16/13 despite being ineligible for hospice care.   Remained on hospice care for 1,012 days until discharge on 9/22/16;

(e)     **Patient ID# 00965633:**    Admitted at Kindred Miami Hospice on 10/21/2011 despite being ineligible for hospice care.  As of 11/28/2016, still receiving hospice care;

(f)     **Patient ID# 01101717:**    Admitted at Kindred Miami Hospice on 09/09/2013 despite being ineligible for hospice care.  As of 11/28/2016, still receiving hospice care;

(g)     **Patient ID# 01388155:**    Admitted at Kindred Miami Hospice on 09/03/2014 despite being ineligible for hospice care.  As of 11/28/2016, still receiving hospice care;

(h)     **Patient ID# 00961253:**    Admitted at Kindred Miami Hospice on 09/24/2011 despite being ineligible for hospice care.  As of 11/28/2016, still receiving hospice care;

(i)     **Patient ID# 01514913:**    Admitted at Kindred Miami Hospice on 04/16/2015 despite being ineligible for hospice care.  As of 11/28/2016, still receiving hospice care;

(j)     **Patient ID# 01345939:**    Admitted at Kindred Miami Hospice on 03/08/2014 despite being ineligible for hospice care.  As of 11/28/2016, still receiving hospice care; and

(k)     **Patient ID# 01439076:**    Admitted at Kindred Miami Hospice on 10/02/2014 despite being ineligible for hospice care.  As of 11/28/2016, still receiving hospice care.

43.     For such patients, Kindred disregarded concerns expressed by Relator and her fellow reviewers that Kindred was admitting and retaining patients who were not eligible for hospice care.

44.     Most of the discussions regarding patient hospice eligibility occurred at bi-weekly Length of Stay Committee ("LOS Committee") meetings.  At these meetings, Relator, the Medical

Director, the managers of the clinical team, and the Director of Clinical Services reviewed patient medical records and recommended whether the patient be recertified for continued hospice eligibility, or, in the alternative, whether continued eligibility was uncertain and the patient needed further review by Kindred's Interdisciplinary Group ("IDG") before remaining on hospice. At the LOS Committee meetings, Relator reported that certain patients receiving hospice care were not eligible for the Medicare-reimbursed hospice benefits because they did not have a prognosis of six months or less to live. Relator also reported that many of the hospice patients' records did not adequately document eligibility (*i.e.*, insufficient documentation to support a finding that the patient was terminally ill) and, thus, did not qualify for hospice care. Despite these warnings and red flags raised by Relator, Kindred continued to certify and recertify patients who were not eligible for hospice care.

45.     Kindred also purposefully limited the number of patients whose medical records were reviewed by the LOS Committee. The LOS Committee meetings were originally held every two weeks, wherein Relator and her fellow reviewers would review every single patient up for recertification. In order to wrongfully restrict patient discharges, however, Kindred directed Relator and her fellow reviewers to review the records of only 6 of the possible 30+ patients up for recertification. When Relator promptly voiced her concerns to Kindred's Hospice Executive Director that far more than 6 patients needed review, the Executive Director immediately dismissed and disregarded the matter. Instead, Kindred knowingly continued to restrict recertification reviews in order to prevent patient discharge and retain ineligible patients on its census.

46.     Kindred also falsified many patients' medical records prior to LOS Committee meetings in order to support hospice eligibility. In preparation for the LOS Committee meetings,

Relator ran "Expiring Certifications Reports" that identified suspect patients who were in their tenth hospice benefit period or more. Prior to the LOS Committee meetings, however, Kindred required Relator and the other auditors to provide a list of patients who's eligibility would be discussed and evaluated at each LOS Committee meeting. Relator recalls that on numerous occasions after providing the list, the patients' records would suddenly state that the patients experienced a change in condition, such as an infection, weight loss, or pain that claimed to support hospice eligibility. In reality, Kindred's nurses were adding false and misleading information – via the purported change in condition – to many patients' records to improperly justify the hospice care and prevent discharge. And those few patients who actually experienced a change in condition nevertheless lacked sufficient documentation to support a "terminally ill" diagnosis. That is because a standard sinus infection, urinary tract infection, or an upper respiratory tract infection does not warrant palliative hospice care.

47. Relator also recalls multiple conversations with Kindred personnel, including members of Kindred's compliance department, affirming that ineligible and unqualified hospice patients were enrolled in Kindred's census. In one conversation Relator had with a compliance nurse with whom Relator audited patients' charts, the compliance nurse stated how another nurse commented that the patients were clearly "not eligible for hospice," but still needed care. In another conversation, an admissions nurse at Kindred Miami Hospice told Relator how she was explicitly ordered by her superiors to admit a certain patient, despite the fact that the patient was not eligible for hospice care. The nurse was told, "I don't care what you have to do. You need to admit that patient this afternoon." Another compliance nurse also identified and shared with Relator several discrepancies with Kindred's hospice consent form, wherein the start of care date was altered, yet the patient was admitted into hospice care regardless.

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920   Fax: 561-370-7401

48.     Further exacerbating these aforementioned practices, Kindred also avoided having physicians themselves make all necessary determinations that a patient was terminally ill and expected to die in six months or less.  Instead, Kindred's business practice was to allow its nurses – and not always its physicians – to make the initial determination of a patient's eligibility for hospice.  At most, the physicians – rather than excise their own independent clinical judgment – would rely exclusively on the recommendation of the reviewing nurses.  And because the nurses' recommendations were tainted by a lack of adequate review and false documentation, the physicians' reliance thereon was based upon incorrect, misleading, and plainly false information.

49.     Most recently, Ms. Silverman received an unsolicited text message from a former colleague at Kindred which read, "Almost at 475 patients *half probably inappropriate admissions[,] horrid messes* but the reps are happy, we are heartland." (emphasis added).  This unprompted text message further illustrates that Kindred wrongly admits and certifies ineligible patients into hospice care, and that Kindred's fraudulent conduct has continued since Ms. Silverman's departure in December 2016.

**B.     Kindred Is Illegally Placing Hospice Patients on, and Failing to Take Patients off, Costlier Levels of Care Than That Which Are Medically Necessary**

50.     As stated, continuous care is the most expensive form of hospice care and is available only for patients who are experiencing a "brief period . . . of crisis" that requires the immediate and short-term provision of skilled nursing hospice services to allow the patient to remain at their residence.  Likewise, general inpatient care is only proper for hospice patients needing pain control or acute or chronic symptom management which cannot be managed in another setting.  To receive Medicare reimbursement for either high level of care, the patient's medical records must adequately support and document the need for continuous care and/or general inpatient care.

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920  Fax: 561-370-7401

51.     Kindred, however, knowingly, wrongfully, and for financial gain places hospice patients on, and fails to take patients off, continuous care and general inpatient care even though the patients do not qualify for such higher levels of care.  In particular, for a substantial percentage of patients receiving continuous care and/or general inpatient care, the medical records do not support the need for the higher level of care.

52.     As part of her job responsibilities, Relator reviewed the records and charts for all patients placed on continuous care.  Every morning – Monday through Friday – Relator took part in "standups," wherein she and her fellow reviewers reviewed each patient's records to determine whether continuous care was proper.  At these standups, Relator expressed concerns that many patients on continuous care lacked the necessary documentation to support – and were, therefore, not eligible – for such a higher and costlier level of hospice care.  In fact, many hospice patients at Kindred Miami Hospice remained on continuous care for several weeks, well beyond any purported "brief period of crisis."

53.     Examples in the continuous care context include:

(a)     **Patient ID# 00803162:** Placed on continuous care on 7/4/16 and remained on that level of care for at least 14 days, despite lacking the medical documentation necessary to qualify for continuous care;

(b)     **Patient ID# 00811175:**  Placed on continuous care on 7/12/16 and remained on that level of care for at least 8 days, despite lacking the medical documentation necessary to qualify for continuous care;

(c)     **Patient ID# 00789043:**  Placed on continuous care on 6/24/16 and remained on that level of care for at least 17 days despite lacking the medical documentation necessary to qualify for continuous care;

(d)     **Patient ID# 0080928:** Placed on continuous care on 7/21/16 and remained on that level of care for at least 18 days, despite

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920  Fax: 561-370-7401

lacking the medical documentation necessary to qualify for continuous care;

(e) **Patient ID# 00783661:** Placed on continuous care on 9/21/16 despite the fact that Patient was experiencing no qualifying symptoms and, therefore, lacked the medical documentation necessary to qualify for continuous care;

(f) **Patient ID# 00824754:** Placed on continuous care on 9/19/16 despite the fact that Patient was experiencing no qualifying symptoms and, therefore, lacked the medical documentation necessary to qualify for continuous care;

(g) **Patient ID# 00823739:** Placed on continuous care on 9/15/16 despite the fact that Patient was experiencing no qualifying symptoms and, therefore, lacked the medical documentation necessary to qualify for continuous care; and

(h) **Patient ID# 00824679:** Placed on continuous care on 9/22/16 despite the fact that Patient was experiencing no qualifying symptoms and, therefore, lacked the medical documentation necessary to qualify for continuous care.

54.    Examples in the general inpatient care context include:

(a) **Patient ID# 00820285:** Placed on general inpatient care on 9/21/16 due to simple urinary tract infection and despite the fact that the patient was documented as having "no pain at that time."

(b) **Patient ID# 00802024:** Placed on general inpatient care on 7/22/16 and remained on that level of care for at least 17 days, despite lacking the medical documentation necessary to qualify for general inpatient care;

(c) **Patient ID# 00683783:** Placed on general inpatient care on 8/15/16 and remained on that level of care for at least 6 days, despite lacking the medical documentation necessary to qualify for general inpatient care;

(d) **Patient ID# 00784716:** Placed on general inpatient care on 8/3/16 despite the fact that Patient was experiencing no qualifying symptoms and, therefore, lacked the medical documentation necessary to qualify for general inpatient care.

55.    Similar to the allegations stated *supra* § VI.A, for such patients, Kindred

disregarded concerns expressed by Relator and her fellow reviewers that Kindred was placing and retaining patients on higher-than-necessary levels of hospice care.

*      *      *

56.     In sum, Kindred defrauded the government by submitting Medicare claims for patients who did not need, were ineligible, and did not qualify, for end of life hospice care, continuous care, and/or general inpatient care.   By submitting Medicare claims, Kindred misrepresented that it was in compliance with all relevant statutory, regulatory, and contractual requirements.   Kindred's misrepresentations were material to the government's payment decision -- *i.e.*, had the government known that the hospice services and level of care provided were for ineligible and unqualified Medicare beneficiaries, the government would not have paid Kindred for its claims.

57.     Upon information and belief, Kindred was also submitting reimbursement claims to Florida Medicaid at a per diem rate for room and board for several of these ineligible patients. Upon information and belief, the 2016 per diem rate for each patient on Kindred Miami Hospice's census was $220.62.

58.     Upon information and belief, the same fraudulent practices are occurring at three other Kindred hospice facilities in Florida: (i) the Daytona Beach facility; (ii) the Ocala facility; and (iii) the Tavernier facility.   Ms. Silverman estimates that since 2011, Kindred has wrongfully received over tens of millions at its Miami facility alone and has wrongfully received additional governmental funds at all four facilities. The fraud continues today.

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL  33401   Phone: 561-671-1920  Fax: 561-370-7401

### COUNT I
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

59.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

60.     As set forth above, from at least 2011 through the present, Defendants presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States government in violation of 31 U.S.C. § 3729(a)(1)(A).

61.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### COUNT II
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)

62.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

63.     As set forth above, from at least 2011 through the present, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

64.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920   Fax: 561-370-7401

## COUNT III
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(G)

65.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

66.     As set forth above, from at least 2011 through the present, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government pursuant to 31 U.S.C. § 3729(a)(1)(G).

67.     The Affordable Care Act requires a person who has received an overpayment of Medicare or Medicaid to report and return the overpayment within 60 days of identification or the date any corresponding cost report is due, and failure to report and return the overpayment is an obligation for the purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G).  *See* 42 U.S.C. § 1320a-7k(d).

68.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendant, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT IV
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
### FLA. STAT. § 68.082(2)(a)

69.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

70.     This is a claim for penalties and treble damages under the Florida False Claims Act.

71.     As set forth above, from at least 2011 through the present, Defendants knowingly

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL  33401   Phone: 561-671-1920  Fax: 561-370-7401

presented or caused to be presented to the State of Florida false or fraudulent claims for payment or approval in violation of FLA. STAT. § 68.082(2)(a).

72.    By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Florida suffered actual damages and therefore is entitled to multiple damages under the Florida False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT V**
**VIOLATION OF THE FLORIDA FALSE CLAIMS ACT**
**FLA. STAT. § 68.082(2)(b)**

73.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

74.    This is a claim for penalties and treble damages under the Florida False Claims Act.

75.    As set forth above, from at least 2011 through the present, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim submitted to the State of Florida in violation of FLA. STAT. § 68.082(2)(b).

76.    By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Florida suffered actual damages and therefore is entitled to multiple damages under the Florida False Claims Act, to be determined at trial, plus a civil penalty for each violation.

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920  Fax: 561-370-7401

## COUNT VI
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
### FLA. STAT. § 68.082(2)(g)

77.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

78.     As set forth above, from at least 2011 through the present, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government pursuant to FLA. STAT. § 68.082(2)(g)

79.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendant, the State of Florida suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### PRAYER FOR RELIEF

WHEREFORE, the United States and Relator demand that judgment be entered against Defendants and in favor of the Relator and the United States as follows:

On Count I through Count VI under the federal False Claims Act (and amended and equivalent state statutes), for the amount of the United States and State of Florida's damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law; the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d) and applicable state laws; all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d) and applicable state laws; and all such other relief as may be just and proper.

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920   Fax: 561-370-7401

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: September 27, 2017.

Respectfully submitted,

DIMOND KAPLAN & ROTHSTEIN, P.A.
*Attorneys for Gael Silverman*
Northbridge Centre
515 N. Flagler Drive, Suite P-300
West Palm Beach, Florida 33401
Telephone:    (561) 671-1920
Facsimile:    (561) 370-7401
By: */s/ Jared A. Levy*
Jared A. Levy, Esq.
Fla. Bar No.: 645486

Primary E-Mail Address:      JLevy@dkrpa.com
                             Scott M. Dimond, Esq.
Secondary E-Mail Address:    Fla. Bar No.: 995762
                             Scott@dkrpa.com
Secondary E-Mail Address:    GFerrara@dkrpa.com

*/s/ Gregory M. Utter*
Gregory M. Utter*
Joseph M. Callow, Jr.*
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6400
Fax: (513) 579-6457
gmutter@kmklaw.com
jcallow@kmklaw.com

*/s/ Joel D. Hesch*
Joel D. Hesch*
THE HESCH FIRM, LLC
3540 Ridgecroft Dr.
Lynchburg, Virginia 24503
Phone: (434) 229-8677
joel@howtoreportfraud.com

*\* Pro hac vice applications forthcoming*
*Attorneys for Relator, Gael Silverman*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of September, 2017, a copy of the Relator's Complaint

was served on the following in accordance with Fed. R. Civ. P. 4.  A file-stamped copy of the

Complaint's Cover Sheet will be served on the following promptly after Relator's counsel receives

such from the Clerk's office.

Hon. Jeff Sessions
Attorney General of the United States
950 Pennsylvania Avenue, Room 4400
Washington, D.C. 20530-0001

Hon. Benjamin G. Greenberg
Acting United States Attorney for the Southern District of Florida
United States Attorney's Office
99 N.E. 4th Street
Miami, FL 33132

Ms. Pam Bondi
Attorney General for the State of Florida
The Capital, PL-01
Tallahassee, FL 32399

Mr. Jeff Atwater
Chief Financial Officer
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL 32399

*/s/ Gregory M. Utter*
Gregory M. Utter

Dimond, Kaplan & Rothstein, P.A.
Northbridge Centre, 515 North Flagler Drive, Suite P-300, West Palm Beach, FL 33401   Phone: 561-671-1920  Fax: 561-370-7401